**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**

| | | |
|---|---|---|
| ASSOCIATED GENERAL CONTRACTORS OF MICHIGAN, | ) | |
| | ) | |
| SCHWEITZER INC., and | ) | |
| | ) | |
| WOLVERINE STEEL ERECTORS INC. | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:26-cv-2137 |
| | ) | |
| SUSAN CORBIN, in her official capacity | ) | |
| as Director of the Michigan Department | ) | |
| of Labor and Economic Opportunity, | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**NATURE OF THE ACTION**

1.      Plaintiff Associated General Contractors of Michigan ("AGC of Michigan" or the "Association Plaintiff") and Plaintiffs Schweitzer Inc. ("Schweitzer") and Wolverine Steel Erectors Inc. ("Wolverine") (collectively, the "Employer Plaintiffs," and together with the Association Plaintiff, "Plaintiffs") bring this action under 42 U.S.C. § 1983 and the Ex parte Young doctrine for declaratory and injunctive relief against Defendant Susan Corbin, Director of the Michigan Department of Labor and Economic Opportunity ("LEO" or the "Department") in her official capacity, to stop her unconstitutional interpretation and threatened enforcement of the Michigan Earned Sick Time Act, Mich. Comp. Laws §§ 408.961–.974 ("ESTA").

2.      ESTA requires an employer to provide earned sick time to each of the employer's employees "in this state." Mich. Comp. Laws § 408.963(1). The statute does not

define that phrase to mean "based in Michigan," and it does not contain any "50% of compensation" territorial test.

3.      Nevertheless, the Department has publicly interpreted ESTA to require a Michigan employer to allow an employee whose employment is "based in Michigan" to accrue and use ESTA while the employee is working outside Michigan, and has further stated that some out-of-state employees physically working in Michigan are covered only if they earn 50% or more of their compensation for time spent in Michigan.

4.      These extra-statutory standards are undefined and not found in the Act. The Department initially took the opposite position—that ESTA applied only to employees physically located in Michigan—before reversing course without explanation.

5.      The Department has also interpreted Mich. Comp. Laws § 408.972 to delay ESTA's application to pre-February 21, 2025 collective bargaining agreements ("CBAs") that mention sick leave or expressly exclude sick leave, while denying the same delay to materially similar pre-existing CBAs that are silent on sick leave. Former Deputy Director Sean Egan personally and publicly communicated the Department's enforcement position regarding ESTA's application to CBAs.

6.      This distinction is irrational because sick leave is a mandatory subject of bargaining under the National Labor Relations Act, 29 U.S.C. §§ 151-169 (2026 Westlaw) ("NLRA"), a CBA's silence on sick leave reflects that the parties' bargained allocation of compensation during the contract term has excluded paid sick leave and not the absence of a binding agreement.

7.      These interpretations deprive Plaintiffs of fair notice, invite arbitrary enforcement, impair existing CBAs, and burden interstate commerce in violation of the Due

Process Clause, Equal Protection Clause, Contracts Clause, and Commerce Clause of the United States Constitution.

8. Plaintiffs seek prospective declaratory and injunctive relief against Defendant in her official capacity.

**PARTIES**

9. The Association Plaintiff, AGC of Michigan, is a Michigan construction-industry trade association whose members include contractors that perform public and private construction work throughout Michigan and in neighboring states.

10. AGC of Michigan's members include union-signatory contractors that employ union-represented workforces and operate under industry CBAs negotiated by AGC on behalf of members who assign their bargaining rights to the association.

11. AGC of Michigan represents more than 125 contracting firms throughout Michigan. AGC of Michigan negotiates with twenty-two local unions for collective bargaining agreements applicable to its signatory members.

12. AGC of Michigan and its members have a direct organizational and economic interest in the interpretation and enforcement of ESTA because the Act affects wages, fringe benefits, bid pricing, labor costs, and the allocation of compensation in existing CBAs.

13. In 2024 and 2025, AGC of Michigan negotiated fourteen collective bargaining agreements with local unions on behalf of its signatory members. These CBAs were executed on May 1, 2024, June 1, 2024, and June 1, 2025, and remain in effect until 2027, 2028, and 2029. Each CBA includes provisions regarding hourly wage rates, overtime pay, vacation pay, medical care, and other fringe benefits.

14. The Employer Plaintiffs and other employers represented by the Association are construction employers with their principal places of business in Michigan and are AGC

members and signatory contractors party to CBAs that do not explicitly address employee sick leave, and that set wages, overtime, vacation, fringe-benefit contributions, and other terms and conditions of employment.

15.     The Employer Plaintiffs and other employers represented by AGC of Michigan sent and will send employees from Michigan to perform project-based work in other states. Under the Department's current FAQ, the Employer Plaintiffs and other employers represented by AGC of Michigan must continue allowing these employees to accrue and use ESTA while they are working outside Michigan because their employment is allegedly "based in Michigan."

16.     To ensure compliance with ESTA, as currently interpreted by Defendant, the Employer Plaintiffs and other employers represented by AGC of Michigan have had to factor the cost of ESTA into their bids, provide workers ESTA time off while they were working outside the state, and incurred substantial costs in providing these benefits.

17.     Under the Department's current FAQ, other employers whose CBAs mention sick leave without providing employees with the benefits required by ESTA receive the benefit of Mich. Comp. Laws § 408.972 and need not comply with ESTA until their CBA expires, becomes amendable, or is renewed, extended, or otherwise renegotiated, even though their CBA does not provide ESTA-compliant paid sick leave during the current contract term.

18.     The Employer Plaintiffs and other employers represented by AGC of Michigan compete with such other employers for substantially similar construction work, including competitively bid projects in Michigan and out of state, and they are similarly situated with respect to whether their pre-existing CBAs conflict with ESTA.

19.     Each Employer Plaintiff is presently subject to the Department's challenged interpretations. Schweitzer and Wolverine and other employers represented by AGC of Michigan

are each party to a specific pre–February 21, 2025 collective bargaining agreement that does not explicitly address paid sick leave and that remains in effect through as late as 2031; all regularly assign Michigan-based employees from time-to-time to perform project work in other states; and under the Department's published FAQ, all must both allow those employees to accrue and use ESTA for hours worked outside Michigan and immediately provide ESTA-compliant paid sick leave under their CBAs. The Department's interpretations are set out in official, published guidance that constitutes the Department's operative enforcement position and that applies directly to each Employer Plaintiff and other employers represented by AGC of Michigan's existing CBA and out-of-state work.

20.     Defendant Susan Corbin is the Director of the Michigan Department of Labor and Economic Opportunity. She is sued only in her official capacity. The Director is responsible for enforcing ESTA. See Mich. Comp. Laws § 408.967(2). In that capacity, the Director receives or causes the Department to receive complaints, investigates claims, may impose relief and civil fines, and may bring civil actions on behalf of employees. See Mich. Comp. Laws § 408.967(1)-(7).

**JURISDICTION, VENUE, AND STANDING**

21.     This action arises under the Due Process and Equal Protection Clauses of the Fourteenth Amendment, the Contracts Clause, U.S. Const. Art. I, § 10, cl. 1, and the Commerce Clause, U.S. Const. Art. I, § 8, cl. 3.

22.     Counts I, II, and IV are brought under 42 U.S.C. § 1983.

23.     Count III is brought directly under the Constitution against Defendant for prospective relief under *Ex parte Young*, 209 U.S. 123 (1908), and *Verizon Maryland, Inc. v. Public Service Commission of Maryland*, 535 U.S. 635, 645 (2002). Plaintiffs' claim for prospective injunctive relief is brought directly under the Contracts Clause through the Ex parte

Page 5

Young doctrine. *See also Dubuc v. Michigan Board of Law Examiners*, 342 F.3d 610, 616 (6th Cir. 2003).

24.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3) and (4). This Court may grant declaratory relief under 28 U.S.C. §§ 2201 and 2202. Plaintiffs seek only prospective declaratory and injunctive relief against Defendant in her official capacity. Plaintiffs do not seek damages or other retroactive monetary relief.

25.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to these claims occurs in this District, including the threatened enforcement of ESTA against AGC of Michigan members located in this District and performing work from this District.

26.    The Association Plaintiff has associational standing to bring this action on behalf of its members under *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977). The Association Plaintiff's members, including without limitation the Employer Plaintiffs, would have standing to sue in their own right; the interests the Association Plaintiff seeks to protect are germane to its purpose; and the claims and requested relief do not require the participation of every affected member.

27.    The Employer Plaintiffs and other employers represented by AGC of Michigan face present and ongoing injury because the Department's published interpretations require them either to incur immediate and unrecoverable compliance costs or to risk investigations, penalties, civil fines, and enforcement actions. These injuries are directly traceable to Defendant's interpretation and threatened enforcement of ESTA and would be redressed by a favorable decision.

28.     The Employer Plaintiffs and other employers represented by the Association face a credible threat of enforcement under the factors the Sixth Circuit applies to pre-enforcement challenges. *See Christian Healthcare Centers, Inc. v. Nessel*, 117 F.4th 826, 842 (6th Cir. 2024); *Boone County Republican Party Executive Committee v. Wallace*, 132 F.4th 406, 416 (6th Cir. 2025). ESTA's enforcement scheme makes such enforcement likely because any employee may file a claim within three years, the Department "shall investigate" the claim, and the Director may order payment of withheld sick time, damages, back pay, reinstatement, and civil fines of up to eight times the employee's hourly wage. Mich. Comp. Laws § 408.967.

29.     The Department has published guidance addressing the Employer Plaintiffs and other employers represented by AGC of Michigan's precise circumstances and has not disavowed enforcement against the Employer Plaintiffs and other employers represented by AGC of Michigan and former Deputy Director Egan publicly affirmed the Department's intent to enforce these positions.

30.     These claims are ripe for adjudication. The Department's interpretations are final and published, require no further agency action to operate, and presently force the Employer Plaintiffs and other employers represented by AGC of Michigan to choose between incurring unrecoverable compliance costs and risking investigation, penalties, and suit. The dispute is fit for judicial decision now, and withholding review would impose immediate and ongoing hardship on Plaintiffs.

31.     The Association Plaintiff has also expended and continues to expend organizational time and resources advising members regarding the Department's shifting interpretations of ESTA, responding to member inquiries, and addressing the disruption of collectively bargained compensation arrangements.

## FACTUAL BACKGROUND

### The Construction Industry and Collective Bargaining

32.      AGC of Michigan negotiates collective bargaining agreements on behalf of its signatory member contractors, setting forth the wages, hours, and terms and conditions of employment for their union-represented employees. Paid sick leave, vacation, wages, overtime, and fringe benefits are mandatory subjects of bargaining and are negotiated as part of an integrated economic package.

33.      Some of the CBAs negotiated by AGC of Michigan do not include provisions directly addressing sick leave.

34.      When a CBA does not include a sick leave provision, that silence reflects the parties' bargained allocation of compensation and benefits during the contract term, not the absence of a binding agreement—typically because the union accepted other economic terms in exchange. See 29 U.S.C. § 158(d).

35.      Because paid sick leave is a mandatory subject of bargaining, a CBA's silence on sick leave is itself a product of negotiation. In the bargaining that produced current CBAs negotiated by the Association Plaintiff, paid sick leave was raised or available to be raised, and the parties deliberately allocated the economic package to wages and other fringe benefits in lieu of paid sick leave. The resulting silence is a negotiated exclusion of paid sick leave during the contract term and not a subject that the parties failed to address.

36.      The construction industry is uniquely affected by paid-leave mandates. Construction projects are competitively bid, and labor costs must be precisely estimated months or years before work begins. Projects are marked by seasonal, transient, or sporadic working periods, with crews moving between jobsites across multiple states. Employee presence at the worksite during critical periods is essential to meeting project deadlines. If deadlines are missed,

AGC of Michigan's members may face liquidated damages claims from the project owners whose projects they bid.

37.     The challenged interpretations impose concrete, presently accruing burdens on the Employer Plaintiffs and other employers represented by the Association. Because construction work is competitively bid and labor costs are fixed before work begins, the obligation to provide and administer ESTA—including for hours worked out of state and during the term of CBAs that do not explicitly mention sick leave, raises the Employer Plaintiffs and other employers represented by AGC of Michigan's labor costs, forces mid-contract administrative changes, and places them at a measurable disadvantage when bidding against employers not subject to the same obligations.

38.     On February 21, 2025, the Legislature enacted Public Act 2 of 2025 (House Bill 4002), which amended ESTA and requires an employer to provide earned sick time to each of the employer's employees "in this state." Mich. Comp. Laws § 408.963(1).

39.     ESTA also provides that if an employer's employees are covered by a CBA in effect on the effective date of the Act and the CBA "conflicts with this act," the Act applies beginning on the stated expiration date in the CBA. Mich. Comp. Laws § 408.972(1).

40.     In addition, ESTA provides that it does not "diminish any rights provided to any employee under a collective bargaining agreement" and, subject to Section 12, does not "preempt or override the terms of any collective bargaining agreement in effect prior to the effective date of this act." Mich. Comp. Laws § 408.971(2)(b)–(c).

41.     At the time AGC of Michigan negotiated many of the CBAs currently in effect, the law exempted employees covered by a private CBA from ESTA's requirements. AGC of Michigan's members relied on that exemption when they structured their labor costs, submitted

competitive project bids, and negotiated the terms of their CBAs. Had ESTA been in effect in its current form at the time of those negotiations, the bargaining over wages, hours, and benefits would have been drastically different.

**Defendant's Shifting and Contradictory Interpretations
Regarding Extraterritorial Application**

42.     The Department has published and maintained public FAQs describing how it interprets and intends to enforce ESTA. These FAQs constitute the Department's official position on enforcement and have been relied upon by employers throughout the State.

43.     In an earlier published FAQ, the Department stated that ESTA applied to work performed by employees who were "physically located in Michigan, regardless of the employer's location." In that same FAQ, the Department gave the example of an employee who worked in Michigan but was sent to Ohio, and stated that the employee "did not accrue hours while working in Ohio" and that the employer "was not required to allow the employee to use accrued ESTA while working in Ohio."

44.     The Department later reversed course without explanation and published contrary guidance stating that ESTA applies to work performed by employees whose employment is "based in Michigan" and who are sent out of state by their employer to work in another location. The Department's current FAQ gives the example of an employee who works for an employer in Michigan, is assigned to perform work in Texas with the same employer, and "continues to accrue and may use ESTA time while in Texas."

45.     The Department's current FAQ also states that an out-of-state employee who comes into Michigan for an out-of-state employer is not covered unless the employee earned "50% or more of his or her compensation for time spent in Michigan."

46.    The phrases "based in Michigan" and "50% or more of compensation for time spent in Michigan" do not appear anywhere in ESTA.

47.    By replacing the statute's territorial phrase "in this state" with different and undefined territorial tests, the Department has created uncertainty over when out-of-state work is covered, when Michigan work is covered, and which employers must bear the costs of compliance.

48.    The Department's "based in Michigan" and "50% of compensation" tests appear nowhere in ESTA and are owed no deference.  *See Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024).

49.    Defendant's reversal is particularly damaging to the construction industry. AGC of Michigan's members regularly send employees to work on projects in other states. Under the Department's revised interpretation, Michigan-based contractors must provide ESTA benefits to employees working entirely in other states—a cost that competing contractors based in those other states do not bear. This places AGC of Michigan's members at a significant competitive disadvantage when bidding on out-of-state work.

**Defendant's Irrational Interpretation Regarding Collective Bargaining Agreements**

50.    The Department has also published guidance addressing how ESTA applies to pre-existing CBAs. The Department's current FAQ states that when a CBA "includes terms related to sick leave, sick time, PTO with uses for sick time, or a similar benefit," the CBA terms apply, "even if the benefit is less than what ESTA requires, until the agreement expires, becomes amendable, or is renewed, extended, or otherwise renegotiated." The Department further states that the same rule applies when the agreement "expressly excludes sick leave benefits."

51.    As an example, the Department states that an employee covered by a November 2024 CBA that includes forty hours of sick time is not subject to ESTA until the CBA expires.

Page 11

52.      By contrast, the Department states in the same FAQ that an employee covered by a CBA that expires in June 2026 and "does not include sick time benefits" is entitled to ESTA beginning February 21, 2025.

53.      The Department therefore interprets Section 12 to grant delayed application to a pre-existing CBA that expressly says "no sick leave," but not to a materially similar pre-existing CBA that is silent about sick leave.

54.      Former Deputy Director Egan publicly stated that the Department's intent is to look at the "totality" of a CBA, and that if a CBA provides paid sick leave benefits to one classification of employees but is silent concerning other classifications, only the latter group immediately began accruing benefits pursuant to ESTA. Deputy Director Egan's public statements are inconsistent with the plain language of the Department's own published FAQ and further demonstrate the arbitrary and shifting nature of the Department's enforcement position.

55.      In the construction industry, this distinction has immediate competitive consequences because signatory contractors with different drafting conventions in otherwise comparable pre-existing CBAs are forced to bear materially different labor costs while bidding on the same work.

56.      For the Employer Plaintiffs and other employers represented by AGC of Michigan, requiring immediate ESTA compliance during the existing CBA term changes the bargained-for economic package by adding a new paid benefit and associated accrual, tracking, and use obligations.

57.      There is no rational basis to treat the Employer Plaintiffs and other employers represented by AGC of Michigan's silent pre-existing CBAs differently from the CBAs of other employers that mention, but which provide lesser benefits than the benefits required by ESTA, or

which expressly exclude sick leave when both contracts leave employees without the ESTA-compliant paid sick leave during the current term.

## IRREPARABLE HARM

58.    The Employer Plaintiffs and other employers represented by AGC of Michigan and all similarly situated member-employers face a credible threat of enforcement now, not merely after a final agency action. If an employer allegedly violates ESTA, an affected employee may file a claim with the Department within three years after the alleged violation, and the Department "shall investigate the claim." Mich. Comp. Laws § 408.967(1).

59.    The Director must enforce the Act, investigate complaints, and may impose relief including payment of improperly withheld earned sick time, damages, back pay, reinstatement, and civil fines of up to eight times the employee's normal hourly wage per violation. See Mich. Comp. Laws § 408.967(2), (5), (7)–(8). If the Director determines that an employer has violated ESTA and the employer does not voluntarily comply, the Director may bring a civil action on behalf of the employee and on behalf of similarly situated employees at the same worksite. Mich. Comp. Laws § 408.967(6).

60.    Because the Department has already announced its interpretations in official public guidance, and former Deputy Director Egan publicly communicated the Department's enforcement position, Plaintiffs are presently forced to choose between immediate compliance with those interpretations and the substantial risk of investigation, penalty, and suit.

61.    The costs of mid-contract compliance, altered bidding, administrative implementation, and interference with existing CBAs are presently accruing and are unrecoverable from Defendant. The ongoing violation of Plaintiffs' constitutional rights constitutes irreparable harm as a matter of law. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Connection Distributing Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998).

62.    These compliance costs are unrecoverable because sovereign and Eleventh Amendment immunity bar any action against Defendant for money damages, and a loss that cannot be recovered for that reason is irreparable. *See Kentucky v. Biden*, 57 F.4th 545, 555-56 (6th Cir. 2023); *Caspar v. Snyder*, 77 F. Supp. 3d 616, 640-41 (E.D. Mich. 2015). The deprivation of bargained-for contractual rights caused by ESTA's immediate application to silent CBAs is likewise irreparable. *See SEIU Health Care Michigan v. Snyder*, 875 F. Supp. 2d 710, 725 (E.D. Mich. 2012).

63.    Plaintiffs have no adequate remedy at law. Absent prospective declaratory and injunctive relief, Defendant will continue to enforce and threaten to enforce ESTA in the unconstitutional manner alleged herein.

**COUNT I**
**Violation of the Due Process Clause of the Fourteenth Amendment**
**42 U.S.C. § 1983**

64.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

65.    The Due Process Clause requires laws and official enforcement standards to provide fair notice of what conduct is required and to protect against arbitrary and standardless enforcement. *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926).

66.    ESTA itself requires earned sick time for employees "in this state." Mich. Comp. Laws § 408.963(1). Defendant has nevertheless publicly interpreted ESTA to apply to employees whose employment is "based in Michigan" even while they are working wholly outside Michigan, and to some employees entering Michigan only if they earn "50% or more of their compensation for time spent in Michigan."

67.    Those extra-statutory standards are undefined, unstable, and not found in the Act. Defendant's earlier published FAQ took the opposite position as to out-of-state work,

Page 14

confirming that employers of ordinary intelligence can reasonably understand the statute and the agency's guidance in different ways.

68.     The due process violation lies in the Department's enforcement standards, not in ESTA's text alone. The Department's published interpretations are the operative rules the Employer Plaintiffs and other employers represented by AGC of Michigan must obey on pain of penalty, and those interpretations supply no ascertainable standard: the Department has never defined what it means for employment to be "based in Michigan," has never explained how the "50% or more of compensation" test is to be measured, and reversed its earlier position without explanation. Enforcement standards that are undefined and unstable deny regulated employers fair notice and vest enforcing officials with discretion without standards in violation of the Due Process Clause.

69.     ESTA imposes significant civil penalties on employers who fail to comply, including fines of up to eight times an employee's normal hourly wage per violation. Mich. Comp. Laws § 408.967(8). Where a statute imposes substantial penalties, the vagueness doctrine demands a higher degree of clarity.

70.     As interpreted and threatened to be enforced by Defendant, ESTA fails to give Plaintiffs fair notice of when out-of-state work is covered, what it means for employment to be "based in Michigan," and when work performed in Michigan by out-of-state employees triggers coverage.

71.     Defendant's interpretation and threatened enforcement of ESTA therefore deprive Plaintiffs of due process and invite arbitrary enforcement, in violation of the Fourteenth Amendment. Defendant is acting under color of state law, and Plaintiffs are entitled to declaratory and injunctive relief under 42 U.S.C. § 1983.

## COUNT II
### Violation of the Equal Protection Clause of the Fourteenth Amendment
### 42 U.S.C. § 1983

72.　　Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

73.　　The Equal Protection Clause forbids irrational differential treatment of similarly situated persons. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

74.　　Defendant interprets Mich. Comp. Laws § 408.972 to postpone ESTA's application to a pre-existing CBA that mentions sick leave or expressly excludes sick leave, but not to a pre-existing CBA that is silent about sick leave.

75.　　Employers operating under silent pre-existing CBAs and employers operating under pre-existing CBAs that expressly exclude sick leave are similarly situated for purposes of Section 12 because both groups have existing bargained-for contracts that do not provide ESTA-compliant paid sick leave during the contract term. The Employer Plaintiffs and other employers represented by the Association are concrete examples of this differential treatment.

76.　　Defendant's distinction between those groups lacks a rational basis. A contractor whose CBA expressly states that employees are not entitled to sick leave receives the Section 12 delay, while a contractor whose CBA reaches the same practical result through silence must comply immediately. That distinction does not rationally advance ESTA's purpose of providing paid sick leave. To the contrary, Defendant's interpretation favors some employers whose employees receive no ESTA-compliant sick leave over other employers whose employees also receive no ESTA-compliant sick leave.

77.　　Defendant's interpretation places Plaintiffs and similarly situated AGC members with silent pre-existing CBAs at an economic disadvantage in the construction industry, where labor costs directly affect competitive bidding.

78.	Defendant's interpretation and threatened enforcement of ESTA therefore deny Plaintiffs the equal protection of the laws, in violation of the Fourteenth Amendment. Defendant is acting under color of state law, and Plaintiffs are entitled to declaratory and injunctive relief under 42 U.S.C. § 1983.

**COUNT III**
**Violation of the Contracts Clause of the United States Constitution**
**Prospective Relief Under *Ex parte Young***

79.	Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

80.	The Contracts Clause provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. Art. I, § 10, cl. 1. The pre-existing CBAs of the Employer Plaintiffs and the Association Plaintiff's similarly situated members are contracts protected by the Contracts Clause.

81.	Applying ESTA during the term of those pre-existing silent CBAs substantially impairs those contracts by adding a new paid leave benefit, new accrual obligations, new tracking and administration requirements, and new statutory penalties that were not part of the bargained-for exchange. The impairment is substantial because wages, paid leave, vacation, and fringe benefits were negotiated as an integrated economic package and allocated across the contract term.

82.	The impairment is heightened by the employers' reliance on the state of the law when they negotiated and executed their current CBAs and priced and submitted competitive bids, at which time the law exempted CBA-covered employees from ESTA. The Employer Plaintiffs and others similarly situated relied on this exemption in allocating compensation and pricing their bids without the cost of ESTA-compliant paid sick leave. Their reliance distinguishes this case from the ordinary, prospective application of a new labor standard.

83.      ESTA itself recognizes the importance of existing CBAs. Section 11 states that the Act does not "diminish any rights provided to any employee under a collective bargaining agreement" and, subject to Section 12, does not "preempt or override the terms of any collective bargaining agreement in effect prior to the effective date of this act." Mich. Comp. Laws § 408.971(2)(b)–(c). The Department's own interpretation of Section 12 contradicts the protective intent of Section 11 by selectively overriding some pre-existing CBAs while honoring others.

84.      The substantial impairment alleged here cannot be avoided through existing vacation-fund contributions or other current fringe benefits because those arrangements do not provide benefits under the same conditions as ESTA and do not satisfy Mich. Comp. Laws § 408.963(7)(b)'s safe harbor. Nor can Defendant require Plaintiffs to cure the impairment by unilaterally converting bargained vacation or fringe benefits into ESTA sick leave during the contract term without changing the parties' existing contractual arrangements.

85.      The challenged impairment is not a reasonable and necessary means of advancing a significant and legitimate public purpose, particularly because the Act itself grants delayed application to other pre-existing CBAs and a narrower construction of Section 12 would avoid the constitutional problem.

86.      Defendant is presently enforcing and threatening to enforce ESTA against Plaintiffs in a manner that continues this violation of the Contracts Clause. Under *Ex parte Young*, 209 U.S. 123 (1908), and *Verizon Maryland, Inc. v. Public Service Commission of Maryland*, 535 U.S. 635, 645 (2002), Plaintiffs may seek prospective declaratory and injunctive relief against Defendant in her official capacity to halt this ongoing violation of federal law.

87.      Plaintiffs do not seek damages or retroactive monetary relief on this claim.

## COUNT IV
### Violation of the Commerce Clause of the United States Constitution
### 42 U.S.C. § 1983

88.  Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

89.  The Commerce Clause grants Congress the power to regulate commerce "among the several States," U.S. Const. Art. I, § 8, cl. 3, and in its dormant aspect restrains the States from discriminating against or unduly burdening interstate commerce. A state law or enforcement practice offends the Commerce Clause when it discriminates against interstate commerce, when it has the practical effect of controlling commerce occurring wholly outside the State's borders, or when the burden it imposes on interstate commerce is clearly excessive in relation to the putative local benefits. *See Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970); *National Pork Producers Council v. Ross*, 598 U.S. 356 (2023).

90.  Defendant interprets ESTA to require a Michigan employer to provide—and to allow employees whose employment is "based in Michigan" to accrue and use—earned sick time for hours those employees work wholly outside Michigan. This interpretation does not condition any in-state sale or transaction, and it does not regulate work performed in Michigan; it directly governs the terms and conditions of employment for labor performed entirely in other States.

91.  *National Pork Producers* does not validate that interpretation. The Court there declined to recognize an "almost per se" rule invalidating any state law with extraterritorial effects, and it did so as to a law regulating in-state product sales that produced only upstream, out-of-state effects. The Court left undisturbed the antidiscrimination principle that lies at the "very core" of the dormant Commerce Clause, and it had no occasion to consider—much less approve—a state practice that directly regulates the terms of employment for work performed wholly in other States. Defendant's interpretation is therefore not controlled by *Ross* and independently offends the antidiscrimination and undue-burden principles that survive it.

92.     The Sixth Circuit has applied these principles to strike down state laws that reach beyond their borders. In *American Beverage Ass'n v. Snyder*, 735 F.3d 362, 374-75 (6th Cir. 2013), the court held a Michigan statute virtually per se invalid as an extraterritorial regulation of commerce; and in *International Dairy Foods Ass'n v. Boggs*, 622 F.3d 628 (6th Cir. 2010), the court recognized that a law with the practical effect of controlling commerce occurring wholly outside the State exceeds the State's authority. The Department's "based in Michigan" interpretation has that practical effect: if Michigan may attach its paid-leave mandate to hours worked entirely in other States, other States could assert the same authority over the same hours, subjecting multistate construction employers to the inconsistent and competing obligations the Commerce Clause forbids.

93.     Defendant's interpretation discriminates against and impermissibly burdens interstate commerce. By attaching a Michigan paid-leave mandate to hours worked outside Michigan, Defendant imposes on Michigan-based contractors a cost that competitors performing the same out-of-state projects do not bear, placing Plaintiffs and similarly situated Michigan employers at a competitive disadvantage in the interstate market for construction services and distorting competition for out-of-state work. Michigan's own minimum-wage law applies only to work performed within Michigan, and Defendant identifies no authority for extending a Michigan wage-and-benefit mandate to services performed entirely in other States.

94.     Defendant's interpretation also fails *Pike* balancing. Whatever interest Michigan has in the sick-leave benefits of work performed within its borders, it has little legitimate interest in regulating sick leave for hours worked entirely in other States, where the employees are present in, and subject to the laws of, another sovereign. The burdens are substantial and clearly excessive in relation to any such local benefit: Michigan-based employers

face inconsistent and potentially conflicting obligations if more than one State asserts authority over the same out-of-state hours, must administer Michigan's accrual, tracking, and use requirements across multistate operations, and are disadvantaged in bidding against out-of-state competitors. Those burdens fall on interstate commerce itself. *See Pike*, 397 U.S. at 142; *cf. Air Transport Ass'n of America v. City & County of San Francisco*, 992 F. Supp. 1149 (N.D. Cal. 1998) (invalidating extraterritorial application of a local employee-benefits ordinance), *aff'd in relevant part*, 266 F.3d 1064 (9th Cir. 2001).

95.    As interpreted and threatened to be enforced by Defendant, ESTA discriminates against and unduly burdens interstate commerce and regulates commerce beyond Michigan's borders, in violation of the Commerce Clause. Defendant is acting under color of state law, and Plaintiffs are entitled to declaratory and injunctive relief under 42 U.S.C. § 1983. See *Dennis v. Higgins*, 498 U.S. 439 (1991).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.    Enter a declaration that Defendant's interpretation and threatened enforcement of ESTA to require accrual or use of earned sick time based on work performed wholly outside Michigan because an employee or employment is "based in Michigan," and/or under any extra-statutory territorial test such as the current "50% or more of compensation" rule, violate the Due Process and Commerce Clauses of the United States Constitution;

B.    Enter a declaration that Defendant's interpretation and threatened enforcement of Mich. Comp. Laws § 408.972 to require immediate ESTA compliance under pre-February 21, 2025 CBAs that are silent as to sick leave while granting delayed application to pre-February 21, 2025 CBAs that mention sick leave or expressly exclude sick leave violate the Equal Protection and Contracts Clauses of the United States Constitution;

C.      Preliminarily and permanently enjoin Defendant, her officers, agents, employees, and all persons acting in concert with her from enforcing ESTA against Plaintiffs and the Association Plaintiff's members with respect to work performed wholly outside Michigan under the challenged out-of-state interpretation;

D.      Preliminarily and permanently enjoin Defendant, her officers, agents, employees, and all persons acting in concert with her from enforcing ESTA against Plaintiffs and the Association Plaintiff's members with respect to employees covered by pre-February 21, 2025 CBAs that are silent as to sick leave during the existing terms of those CBAs;

E.      Enjoin Defendant from imposing or threatening to impose civil penalties or filing enforcement actions against Plaintiffs and the Association Plaintiff's members based on the challenged interpretations described in this Complaint;

F.      Award Plaintiffs their reasonable attorneys' fees and costs under 42 U.S.C. § 1988 for their successful claims under 42 U.S.C. § 1983; and

G.      Award such other and further relief as the Court deems just and proper.

Respectfully submitted,

**MARTONE LEGAL, LLC**

By:    */s/ Andrew J. Martone*
       Andrew J. Martone,        MO37382
       600 Emerson Rd., Suite 205
       Creve Coeur, MO 63141
       Telephone:    (314) 862-0300
       Facsimile:    (314) 862-7010
       andym@martonelegal.com

       *Attorneys for Plaintiffs*